O4A6WILS                     Sentencing

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                        20 CR 126(LTS)

 5    ROBERT WILSON,

 6                   Defendant.

 7    ------------------------------x

 8                                        New York, N.Y.
                                          April 10, 2024
 9                                        11:05 a.m.
      Before:
10
                      HON. LAURA TAYLOR SWAIN,
11
                                          District Judge
12
                            APPEARANCES
13

14    DAMIAN WILLIAMS,
           United States Attorney for the
15         Southern District of New York
      BY:  ADAM HOBSON
16         Assistant United States Attorney

17    ALBERTO A. EBANKS
           Attorney for Defendant
18

19

20

21

22

23

24

25
```

1              (Case called)

2              THE COURT:  Again, good morning.  Counsel, please

3       introduce yourselves.

4              MR. HOBSON:  Good morning, your Honor.  Adam Hobson,

5       for the government.

6              THE COURT:  Good morning.

7              MR. EBANKS:  Albert Ebanks, on behalf of Mr. Wilson.

8              THE COURT:  Good morning, Mr. Ebanks.

9              And good morning, Mr. Wilson.

10             THE DEFENDANT:  Good morning, your Honor.

11             THE COURT:  Mr. Wilson, are there members of your

12      family and friends here in court today?

13             THE DEFENDANT:  Yes, your Honor.

14             THE COURT:  Good morning.  Thank you, all, for coming

15      here to court today.

16             And I remind everyone that there is to be no recording

17      or transmission of any part of this proceeding if you have any

18      sorts of devices with you.

19             We are here today for sentencing.  I have received and

20      reviewed the presentence investigation report, which is dated

21      January 26, 2024, including the recommendation and addendum, as

22      well as defense counsel's March 27, 2024 submission, which is

23      accompanied by medical records relating to an injury that

24      Mr. Wilson sustained when he was a teenager, a high school

25      equivalency diploma for Mr. Wilson, a notice of the results of

1  an exam that Mr. Wilson took to work with the transit

2  authority, a job offer letter, documents relating to the

3  conditions at the MDC, and eight letters of support from

4  Mr. Wilson's family members and friends.

5          I also received and reviewed the government's

6  April 3rd, 2024 letter submission.

7          Are there any other written submissions that the

8  parties intend me to consider in connection with the

9  sentencing?

10         MR. HOBSON:  No, your Honor.

11         MR. EBANKS:  Just one, your Honor.  I have a

12 certificate I handed up to Mr. Hobson that I only received

13 yesterday from MDC.  May I pass it up to the Court?

14         THE COURT:  Yes, please.

15         MR. EBANKS:  Should I just walk it up?

16         THE COURT:  Yes.  My law clerk will take it.

17         MR. EBANKS:  I was also hoping to have a letter from

18 Columbia University, the MDC campus, but because of the

19 constant state of lockdown at MDC, I was unable to secure that

20 letter from Columbia University, your Honor.

21         THE COURT:  And so I take it your representation is

22 that Mr. Wilson has completed a class with the

23 Columbia University program there?

24         MR. EBANKS:  Enrolled.

25         THE COURT:  Enrolled.

1              What sort of class?

2              MR. EBANKS:  History, your Honor.

3              THE COURT:  And I note for the record that this is a

4    certificate from the MDC-Brooklyn Recreation Department

5    certifying that Mr. Wilson has taken the century class, which

6    was described as basic fit, in February of this year.  And

7    since this is a color printout, I will let Mr. Zargar give it

8    back to you at the end of the proceeding for your records.

9              MR. EBANKS:  Thank you.

10             THE COURT:  Mr. Hobson, would you please make a

11   statement for the record concerning the government's victim

12   identification and notification activities in connection with

13   this proceeding?

14             MR. HOBSON:  Yes, your Honor.  We have not identified

15   any specific victims to whom we can notify with respect to this

16   proceeding.

17             THE COURT:  Thank you.

18             Mr. Ebanks, have you read the entire presentence

19   report and discussed it with Mr. Wilson?

20             MR. EBANKS:  Yes, your Honor.

21             THE COURT:  And have you also reviewed all of the

22   submissions and discussed them with Mr. Wilson?

23             MR. EBANKS:  Yes, your Honor.

24             THE COURT:  Mr. Wilson, have you yourself reviewed the

25   entire presentence report?

1      THE DEFENDANT:  Yes, your Honor.

2      THE COURT:  Have you discussed it with Mr. Ebanks?

3      THE DEFENDANT:  Yes, your Honor.

4      THE COURT:  Have you also reviewed and discussed the

5  additional submissions with Mr. Ebanks?

6      THE DEFENDANT:  Yes, your Honor.

7      THE COURT:  Mr. Ebanks, does the defense have any

8  objections or other issues with respect to the content of the

9  report that you wish to address?

10      MR. EBANKS:  No, your Honor.

11      THE COURT:  Mr. Hobson, does the government have any

12  objections or other issues with respect to the content of the

13  report that you would like to address?

14      MR. HOBSON:  No, your Honor.

15      THE COURT:  Is the government applying to have

16  Mr. Wilson credited with the third point for acceptance of

17  responsibility?

18      MR. HOBSON:  Yes, your Honor.

19      THE COURT:  That application is granted, and I note

20  that the third point is already incorporated into the PSR.

21      Does the government seek forfeiture in this case?

22      MR. HOBSON:  Your Honor, we have not identified a

23  forfeiture amount in this case, so, no.

24      THE COURT:  Thank you.

25      And so I'm about to ask counsel, beginning with

1   Mr. Ebanks, to speak generally to sentencing issues.  I would

2   ask that in their remarks, counsel touch on what seems to be a

3   factual, if not dispute, at least lack of clarity as to their

4   contentions as to whether this current offense conduct began in

5   2016, as the government's submission suggests, or only in 2018,

6   following Mr. Wilson's leg injury, which is what the defense

7   submission suggests.  So that's one issue — when the conduct

8   began.

9       I'd also like the parties, and particularly the

10  government, to share views on Mr. Wilson's relative culpability

11  in the charged conduct.

12      And I note that the probation office has suggested, in

13  the recommendations of special conditions, a stayaway

14  provision, which is a little bit vague in its language.  It

15  refers to areas known to be frequented by certain gang members

16  or known to be controlled by gang members, and that sort of

17  begs the question of known by whom and at what time.

18      And so, to the extent counsel wish to suggest some

19  more definite sorts of parameters, whether a ten-block radius

20  at X, or X section of the Bronx, I would prefer to have some

21  more concrete provision there that would help to protect

22  Mr. Wilson from temptation and from invitations to conduct he

23  shouldn't be involved in and, also, of course, to protect the

24  community.

25      MR. HOBSON:  Your Honor, just to clarify, you're

1   talking about on Page 30, the last sentence of the special

2   conditions?

3                   THE COURT:  Let me just --

4                   MR. HOBSON:  I want to make sure we're looking at the

5   correct language.

6                   THE COURT:  Yes.

7           And so the special conditions on Page 30, the last

8   paragraph, "You shall not associate or interact in any way,

9   including through social media, with gang members or

10  associates, or frequent neighborhoods or turf known to be

11  controlled by the Bloods gang."

12                  MR. HOBSON:  Thank you, your Honor.  We'll address

13  that.

14                  THE COURT:  Thank you.

15          All right.  So, Mr. Ebanks, whenever you're ready.

16                  MR. EBANKS:  I am ready, your Honor.  And thank you.

17                  THE COURT:  Thank you.

18                  MR. EBANKS:  Your Honor, you already indicated that

19  you have considered and reviewed all of my submissions, as well

20  as the government's submissions and the presentence report.

21  So, basically, this morning, I'm going to rely heavily on my

22  submissions, but I do feel that there are a few salient points

23  which I must make prior to the Court imposing sentence this

24  morning on Mr. Wilson.

25          However, before I do that, your Honor, let me just

1    tell you a little bit about who is seated in the gallery this

2    morning.

3            There's no shortage of people in the courtroom this

4    morning, your Honor.  Present this morning, we have my client's

5    fiancée in the back row, Ms. Polanco.  Also in that row, her

6    father is seated there.  You have cousins, uncles, stepfather,

7    and you have his sister.  His sister, who is a sergeant in the

8    U.S. Army, could not be here today.  I think that there was

9    something involving a deployment that prevented her from

10   appearing here this morning.

11           Many of the folks that you see here this morning,

12   your Honor, are the authors of several letters that you have

13   received, and I know you have reviewed them.  Amongst them is

14   Ms. Marte, who is my client's neighbor.  Ms. Marte tells you

15   that my client protected her daughter from sexual predators in

16   that community.  She also tells you that when her apartment was

17   on fire, she had seven children, that my client is running into

18   the apartment to save her and her seven children when everyone

19   is running out of the building.  He runs in not once, but

20   twice.  After he helps the family get out, he wants to make

21   sure that they have something to wear, and he runs back in.

22           I could really get into every single letter, because

23   the letters are so powerful as they speak to my client, but

24   I've selected just a few, your Honor.

25           THE COURT:  And I will confirm that I have read

1   everything carefully.

2          MR. EBANKS:  I know the Court has, your Honor.  I

3   appreciate that.

4          There's also a letter from Mr. Polanco, my client's

5   future father-in-law.  This is a wedding, by the way, that I

6   intend to attend, your Honor.

7          Mr. Polanco is seated in the back row of the

8   courtroom.  He tells you that he believes that at the time that

9   my client got involved in this conspiracy, that he was in

10  full-blown survival mode.  He has basically adopted Mr. Wilson

11  as his own son.  He sees the good in this man.  He also tells

12  you that despite the fact that Mr. Wilson will pay the price

13  for committing this offense, which involves jail time, that he

14  believes that his daughter would do well with Mr. Wilson as her

15  life partner.  As you know, Mr. Wilson has two children with

16  Mr. Polanco's daughter.

17         This is Mr. Polanco, his future father-in-law,

18  speaking to you, your Honor.  I have to believe that as the

19  father of the future bride, he wants what's best not just for

20  Mr. Wilson, but also for his daughter, and he's asking this

21  Court to do what I am asking this Court to do, which is, this

22  morning, sentence the whole individual, the entire individual,

23  not just this short time period or this time period involved

24  during the conspiracy.

25         Your Honor, Mr. Wilson, when he was 14, had his face

brutally slashed.  Here he is 14 years old, no history of

juvenile delinquency, minding his own business, walking around

in his community, and he had his face brutally slashed.

14 years old, and his face is slashed.  He receives

50 stitches.

That is disturbing.  What is even more unsettling,

your Honor, is, as a result of that injury, he will never again

in his life smile or frown because there was nerve damage to

his face at the age of 14.

He goes on to high school.  He makes it to 12th grade,

your Honor, in high school.  This was not an easy high school

to attend.  I know that firsthand because I went to that high

school.  Every day was difficult.  But he makes it to 12th

grade in that school, and then he responds to violence with

violence, and we know that his high school career is derailed,

and he ends up going to prison.

Now, your Honor, this is a good time to tell you that

I explored that case.  There was a lot of -- there was a

significant violent history that the individual involved in

that case had, and he had a propensity for violence, and these

are things that my client knew at the time that he acted.  In

state court, we call that Miller material, what the defendant

was aware of at the time that he acted.  I don't know if that

was ever fully explored, that ship has sailed, and we must move

on.  Be that as it may, he does not graduate from high school.

1    Golda Meir said you cannot negotiate peace with

2  someone who has come to kill you.  He made a very difficult

3  decision, and he was 17 years old at the time, and he goes to

4  prison.  Now, he was close to graduating from high school, and

5  he didn't give up.  He made it to his senior year.

6    His sister, Sergeant Taylor, who is serving our great

7  nation in the United States Army, described Mr. Wilson as

8  resilient.  His other sister, Raynisha, who is present today in

9  the second row, your Honor, describes Mr. Wilson as determined.

10 He is all of that.

11    At the age of 17, Mr. Wilson was delivered to Attica.

12 I was in Attica less than 90 days ago.  I could speak to you

13 for days about Attica.  I will not do that.  But when you think

14 about a 17-year-old boy, a young man, dropped off in Attica,

15 with the chaos that's going on there, and the fact that he

16 focused on getting his GED, and he got his GED while in Attica,

17 I think that that speaks volumes.

18    Your Honor, probation has provided this Court with

19 records that indicate that while my client was incarcerated, he

20 worked as a porter, as an industries worker, he worked in food

21 services, and he worked as a store laborer.  You also, no

22 doubt, have seen that there was an infraction history from his

23 incarceration.

24    I looked at that infraction history.  The bulk of the

25 infractions take place in the first three years.  As you might

1   imagine, it's not easy to make your way through prison at 17 in

2   that setting.  What stands out to me is that in his last

3   five years of incarceration, he has two infractions for

4   fighting in five years.  So you can see things changing for

5   him.

6        I would be remiss if I did not speak to the parole

7   violation.  He has a technical parole violation in 2013, which

8   resulted in a return to custody for 12 months.  There's a

9   second parole violation, which was ultimately dismissed after a

10  full-blown investigation by the district attorney's office.

11  They did not dismiss that because of any reason other than the

12  fact that the evidence was not there to suggest that my client

13  was involved in any criminal activity.  Parole gave him time

14  served.

15       Your Honor, my client is the father of four children

16  ranging in ages from 2 to 11.  When I pointed out to you

17  earlier this morning everyone who is in the courtroom, if you

18  notice, there are no children in this courtroom.  When I

19  asked — I call him Rob, and I spend a lot of time with Rob.  I

20  asked Mr. Wilson would, I get a chance to meet his children.

21  He said:  No, you will not, unless you visit my home.  My

22  children will not see me in this setting.

23       I have been doing this work, your Honor, I'm in my

24  third decade now doing this work, and I will tell you something

25  that I've never said before because it's never presented itself

1  before.  Since the day that my client went to MDC, he has

2  refused to have one single visit with his children in that

3  chaotic setting because he doesn't want them to be mentally

4  scarred by seeing their father in that setting, and he

5  certainly did not wish to have them here today, propped up for

6  the Court, so that the Court could take some sort of mercy,

7  seeing the children.  His children are not here.  His children

8  are in his heart, but they are not in this courtroom.

9          This conspiracy basically ends in 2020.  My client

10  stays arrest-free and out of trouble until the time that he is

11  arrested for a VTL violation.  I represented him on that VTL

12  violation.  That matter was dismissed.

13          That's a three-year period of no new arrests.  I hope

14  the Court takes that into consideration.

15          I also think it's worth noting what you've pointed out

16  earlier, your Honor, that while he's involved in this

17  conspiracy, he is looking for the off-ramp, he is looking for

18  the exits, he submits letters of employment, applications for

19  employment to the MTA as a track worker, as well as a painter.

20  This is not a man who was thinking of making a career out of

21  selling drugs.

22          I also submit to this honorable court that my client

23  gets involved in this conspiracy at a point where he has lost

24  his job at Action Carting due to a serious leg injury and after

25  the disability benefits have run out.

1          Your Honor, my client basically drifts into this

2    world.  I don't think that he woke up and set a direct course

3    for this type of conduct.

4          One thing that stands out to me is that I've seen

5    hours of video, and that on more than one occasion, Mr. Wilson

6    is dealing 40 to 50 dollars worth of drugs to New York Police

7    Department undercover officers.  I bring that up to you because

8    there's a role adjustment in this case, and in all my years

9    doing this work, there are very few real bosses, your Honor,

10   that are out on the front lines distributing or selling $40

11   worth of drugs to someone at the street level.

12         When I was a young assistant in the Bronx, we referred

13   to people who were dealing at the street level as Dixie cups.

14   That was the term that we would use for them because they were

15   disposable.  So I think that what we really have to weigh here

16   is what's he actually doing, and I hope that the Court will

17   consider that.

18         I am happy to say, your Honor, that it's pretty clear

19   to me, at least, that this is not a man who was looking to get

20   rich from this, he wasn't making ridiculous posts on social

21   media flashing money.  He did not go into this because of

22   greed.  I believe that he was trying to get by.  Since he's

23   been at the MDC, he's not had one infraction.  He's not been

24   involved in any gang activity.  He's told this Court through

25   his lawyer, and he will tell you himself, that he is not a

1    member of any gang.  He does not have one single gang tattoo on

2    his body.  Was he involved with a drug trafficking

3    organization?  Yes.  Is he a gang member?  No.  And that

4    exposes him as a lone wolf to many perils of prison life.

5    However, it helps him because when he is released from prison,

6    he doesn't owe anyone anything, and he can be his own man.  So

7    with regards to the suggestion that he should maintain his

8    distance from gang activity, oh, yeah, he has no desire to go

9    anywhere near any of that.

10            I wanted to point out to this Court the sentences that

11    this Court has handed out to other defendants in this case, and

12    then I remembered that the Court is wise, and you don't need me

13    to tell you what you have done with other defendants in this

14    case.

15            THE COURT:  I have reviewed them.

16            MR. EBANKS:  Your Honor, there are so many different

17    metrics when you consider the different defendants in this

18    case, that it becomes virtually impossible to decide who is

19    more culpable and who deserves more time because it depends on

20    which metric, if any, you were to focus on.  So I don't think I

21    need to take up this Court's valuable time getting into the

22    comparison, the comparison of some other defendants who are

23    involved in 2 kilos of fentanyl, the discussion of other

24    defendants who are career criminals, the discussion of other

25    defendants in this case who have been sentenced who are sending

1    out kites while they're behind bars, who are telling the warden

2    ungodly things, who have clearly not decided to turn their

3    lives around.

4            I'd like to just discuss briefly life after my client

5    is released from prison.

6            Your Honor, I believe it was Marcus Aurelius who said

7    that if a man has a why, he can handle any how.  My client has

8    many whys.  They are all right here before you.  And there are

9    the additional four whys, reasons, why he wants to live a

10   law-abiding life, as he has done for significant periods in the

11   past.  And those are his four children, who are not, again,

12   present in this courtroom.

13           He has a devoted partner who is waiting for him upon

14   his release.  He has at least one job waiting for him because I

15   believe that one of the letters told you that Mr. Polanco has

16   made arrangements for his future son-in-law to be gainfully

17   employed.  But I've also heard, and this is a representation

18   again as an officer of this Court, that Action Carting, where

19   he worked immediately before being injured, they just loved

20   him.  He was early to work, late to leave, a company guy, and

21   they'd like to have him back.  So I believe he has two job

22   opportunities waiting for him.

23           We know that he's committed to his future because he

24   was applying for jobs with the MTA and applying for jobs as a

25   painter.  He's in college as we speak now, whenever college can

1   meet, and that's based on the schedule at MDC and when people

2   are not locked down.

3            I believe that he has every reason to leave the prison

4   setting and come home to the outstretched arms of a welcoming

5   family and to get back to doing the work he was doing before of

6   raising his family.

7            Your Honor, if we turn now to what an appropriate

8   sentence is in this case, I have, in the past, suggested to

9   this Court, your Honor, that it is not my practice to ask for

10  any specific sentence.  I do feel that there are some unique

11  circumstances presented here, and I realize that because there

12  is a mandatory minimum here, there is no possibility of

13  leniency.  There are only varying degrees of significant

14  sentences which are available as an option to this Court.

15           Probation has recommended a variance.  But today, I

16  will — in fact, I must — your Honor, ask this Court to go

17  further.  I will ask you to sentence Mr. Wilson well below the

18  guidelines.  He has learned his lesson.  He's walked away from

19  this conspiracy years ago.  He has led a law-abiding life

20  for years.  He has every reason to continue to live a

21  law-abiding life.  He is looking forward to doing exactly that,

22  and that is why a variance from the guidelines, in my opinion,

23  would be sufficient, but not greater than necessary, to comply

24  with the statutory sentencing purposes and goals.

25           And, your Honor, I thank you for your time and your

1    attention this morning.

2              THE COURT:  Thank you, Mr. Ebanks.

3              Did you want to say anything about the geographic

4    provision?

5              MR. EBANKS:  I know that my client and his fiancée

6    have discussed the desire to move out of that neighborhood.  I

7    think they're going to have a little time to plan their exit

8    out of that community.  As I stated earlier, he is not a member

9    of any gang.  He does not wish to be affiliated with any gang

10   members.  So to the extent I can address that by telling the

11   Court that it is, in fact, his conscious objective to move from

12   that community, so as to have a fresh start, but stay in the

13   New York City area.  He has job opportunities awaiting him

14   here.  That is what he wishes to do.

15             THE COURT:  Thank you.

16             MR. EBANKS:  Does the Court have any questions of

17   counsel, your Honor?

18             THE COURT:  No.  Thank you, Mr. Ebanks.

19             MR. EBANKS:  Thank you, your Honor.

20             THE COURT:  Mr. Hobson.

21             MR. HOBSON:  Yes, your Honor.  I have a lot to address

22   there, because Mr. Ebanks is describing a person that's

23   inconsistent with everything I know about Mr. Wilson and the

24   undisputed facts of the PSR about Mr. Wilson.  So I'm going to

25   try to identify all of those — I apologize if it's in a bit of

1   a haphazard, disorganized manner — and also to address the

2   Court's question.

3           I want to begin with relative culpability.  Mr. Ebanks

4   said that there are too many metrics here to do a culpability

5   analysis.  That's simply not true.  There are multiple metrics

6   here, but on every metric, Mr. Wilson is the most culpable of

7   the defendants here.  He's the only defendant to receive

8   leadership points because he was the leader of this

9   organization.  He had guns.  He received a gun enhancement.

10  Not all of the defendants in this case had guns.  He ordered

11  violence.  He supplied the drugs.  He ordered the young men in

12  the gang to distribute the drugs.  He got the proceeds from

13  those drugs.  All of the other defendants in this case were

14  under Wilson.  He is the most culpable by far, and the

15  guidelines sentence reflects that.

16          In terms of the conduct and where it began, I think I

17  still hear Mr. Ebanks saying that it began in 2018.  That is

18  not true.  The first undercover buy into this organization was

19  made in 2018 to the defendant.  I think it's very unlikely that

20  that happens to be the day that he just started selling drugs.

21          To the contrary, we have multiple cooperating

22  witnesses from the gang who said that Wilson was a member of

23  the Bloods gang, specifically from the Sex Money Murda tribe,

24  or sect, that he was in that gang and selling drugs at least as

25  early as 2016, that one of our cooperating witnesses, who was a

O4A6WILS                     Sentencing

young man who was selling drugs for Mr. Wilson, was selling

drugs for him throughout 2017, saw him in trap houses, saw him

with guns during that time period.  And we had another

cooperating witness who left the gang around the 2017/2018

period, but knew of Mr. Wilson as being a member of the gang

who was selling drugs in that area.  So all of our evidence

shows that at least as long ago as 2016, he was selling drugs,

also as a member of the gang.

        I think that's supported by just the nature of what

he's doing too.  He has an army of young Bloods gang members

selling drugs at his direction.  He is there in a car watching

to make sure they are selling.  He is giving them the drugs.

He is making sure they have guns.  He is ordering violence on

their behalf.  He is making them bring the drug proceeds back

afterwards.  You don't just happen into that in 2018 and

suddenly have an army of young gang members selling for you if

you're not already in the gang and if you haven't already

established yourself.  The defendant is not some

out-on-his-luck drug dealer who was driven to do this for a

couple of months just to make ends meet.  This is the lifestyle

he chose.  He was in it for a considerable amount of time, and

he was taking conscious steps to further this enterprise.

        We've told the Court multiple times about what this

enterprise was, though it's been a bit of time since I was

before the Court, so I want to emphasize, this was an extremely

1    violent gang operation in the vicinity of 194th Street in the

2    Bronx.  They basically turned this area into an open air drug

3    market.  Residents complained; residents were terrified.  There

4    were frequent acts of violence in the neighborhoods.

5    Shootings, jumpings, slashings, all of that was part of this

6    gang violence, and Wilson was running this operation.  He was

7    running the drug part of the operation, and he was also

8    ordering violence on behalf of the operation.

9           One of those acts of violence, as set in the PSR,

10   occurred in 2017, another reason that we know that he did not

11   begin this in 2018.  In 2017, one of his young workers got a

12   sale stolen from him by another gang member, and he ordered one

13   set of the gangs to retaliate against the other set in a

14   shooting in the neighborhood.  That shooting occurred on a

15   residential street where innocent bystanders were around.

16   That's the kind of operation this defendant was running.

17          As for the post 2020 conduct, it's true that in 2020,

18   as the Court might remember, I believe February 2020, we

19   charged this case and unsealed the indictment.  We arrested

20   most of the defendants in the case.  We did not arrest

21   Mr. Wilson, who has been the lead defendant in this case from

22   the beginning, because he evaded law enforcement that day.  It

23   took us three years before we could find Mr. Wilson.

24          I will note that it is not true that he was

25   arrest-free during that time.  In January of 2023, he was

1    actually arrested because he was found in a car with another

2    drug dealer who had just passed off a package of what appeared

3    to be narcotics.  That was part of a long-running DEA

4    investigation into another crew that was operating a few blocks

5    away from where Mr. Wilson's crew operated.  That drug dealer,

6    a man named Edwin Carrasquillo, has since been arrested and is

7    facing charges here in this district for running that drug

8    operation.  The defendant was in the car with him.  My

9    understanding is that on that day, they did not bring charges

10   against Mr. Carrasquillo because they did not want to blow the

11   operation, and they also did not bring charges against

12   Mr. Wilson because they did not know his full involvement in

13   that operation.

14          Mr. Wilson provided a fake identification name during

15   his arrest, and was actually let go.  Later, from his

16   fingertips, they realized that it was the Robert Wilson who had

17   an arrest warrant out for him.  That's why he was not actually

18   apprehended in January 2023.  In June 2023 -- actually, I'm

19   sorry, I said January.  I meant to say March 2023.

20          In June 2023, a few months later, is when he was

21   arrested for fleeing from police in a car and reckless driving.

22   That time, people realized he was the right Robert Wilson and

23   arrested him.

24          I don't think that three years of evading law

25   enforcement, including two arrests, is actually consistent with

1   turning his life around and the story that Mr. Ebanks is trying

2   to paint of him.  Obviously, we didn't have an active

3   investigation into him at that time.  We can't use our

4   undercovers to be in the neighborhood anymore and buy drugs

5   from people, so we don't have drug sales from him, but that's

6   certainly not consistent with a law-abiding life.

7           I want to spend a minute on his criminal history.

8           I don't think there's anything mitigating at all about

9   his criminal history.  It is very, very serious.  When he was

10  17, he was charged with shooting someone.  Mr. Ebanks is trying

11  to suggest that the victim maybe deserved it.  I don't know

12  what that is based on.  It's certainly not consistent with the

13  sentence he got there, which was 13 years for shooting someone.

14  It's hard to know what that person did, absent a self-defense

15  defense, which does not seem to have been asserted, that would

16  have justified him being shot.  We don't allow people to shoot

17  gang members, just as we don't allow them to shoot innocent

18  bystanders.  It's a very serious offense, and he got a very

19  serious sentence for it — 13 years.

20          His prison conduct was not good during that time,

21  which, I submit, shows that this was not some aberrational act

22  of Mr. Wilson.  He was released after 11 years to parole.  He

23  violates parole and is back in for a year.  He's released

24  again, violates parole again, and is back for over a year.  So

25  he actually served that 13-year sentence.  He gets back on the

1    streets and returns to drug dealing, the very conduct he was

2    charged with here.  So, if that 13-year sentence did not deter

3    him, I, frankly, don't know what will.

4         Once he's back and selling drugs, it's important to

5    note his age.  He's in his late thirties at that point.  That's

6    a point when most drug dealers have aged out of this.  The

7    other defendants that have been before your Honor on this case

8    were all in their late teens, early 20s, when they were

9    committing these crimes.  Generally, the hope is that a big

10   arrest is a wake-up call, and they turn their lives around and

11   don't return to the same thing after serving a significant

12   sentence.  This defendant was arrested in his late teens for a

13   serious crime, did a serious sentence, and did not learn his

14   lesson, returned to committing crimes.  So in his late 30s, he

15   is running this operation, and the people he's using to sell

16   his drugs are in their teens and early 20s.  We submit that

17   that is an aggravating factor itself.

18        The harm that Mr. Wilson is causing here is obviously

19   to the drug addicts, obviously to the community that he's

20   ravaging, obviously to the victims of his violence, obviously

21   again to the community who is having to deal with his violence,

22   but it's also to the young men that he's recruiting to sell his

23   drugs for him and that he's ordering to sell drugs day in and

24   day out, that he's sitting there in his car watching to make

25   sure they are following his directions, selling drugs, bringing

him back the drug money instead of going to school, instead of

going to college, instead of turning their lives around.  He's

forcing these kids, who are vulnerable and subject to his

influence, to follow the same footpath he did, and he doesn't

seem to have cared about it.

        Mr. Ebanks is trying to paint him as someone who was

dragged into this life by circumstances.  I don't know what

happened to him at age 17.  Maybe that was true at age 17.  It

was not true at age 35, 36, 37, when he had 17-year-olds

working for him committing these crimes, being part of this

gang, and committing violence for the gang.

        For all of these reasons, we think the guidelines

range here of 168 months to 210 months gets it right.

Probation, it's true, is recommending a slight variance, to

144 months.  That's about, I think, 14 years, if my math is

correct.  That's essentially the time he did before -- no,

sorry, 12 years.  12 years.  So that's less time than he did

before.  We know that sentence didn't deter him before.  We

know that he escalated.  We know that his crimes got worse, not

better, after serving that amount of time.  We think the

guidelines are right here.

        I think the only remaining question the Court had for

me is the special condition?

        THE COURT:  Yes.

        MR. HOBSON:  I think with that, I would suggest adding

1    a knowingly, not to knowingly associate.  And we would not

2    object if the Court's troubled by the neighborhoods.  I think

3    that there are a lot of places where that limitation makes

4    sense, larger, less densely populated areas.  Given the reach

5    of the territory that the Bloods control in the Bronx, I can

6    understand how the Court might be concerned about drawing

7    lines.  Perhaps in this case, we can rely on just the not

8    associating, and we don't need the geographic location, the

9    geographic limitation.

10             THE COURT:  Thank you.

11             Mr. Ebanks, would you have any objection to just

12   saying not associate knowingly and taking off the geographic?

13             MR. EBANKS:  I don't agree with Mr. Hobson on many

14   things.  I agree with him on that language, your Honor.

15             THE COURT:  Mr. Wilson, would you like to speak for

16   yourself before I decide on your sentence?

17             MR. EBANKS:  Yes.

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  Please stand.

20             Mr. Ebanks, would you pull the microphone closer to

21   Mr. Wilson.  Thank you.

22             THE DEFENDANT:  Thank you.

23             Your Honor, thank you for letting me say a few words

24   here today.

25             Today is a day of embarrassment.  I let a lot of

1    people down.  I sold drugs, and now I have to pay for my

2    actions.  Nothing what I did was right, nor could it be

3    excused.

4         I have been incarcerated at MDC these last nine and a

5    half months with time to reflect on a crime I committed and

6    even why I committed the crime.  I've helped contribute to some

7    people's downward spiral.  Excuse me.  I'm sorry.  I've always

8    wanted to help people, and it's the toughest thing I have to

9    realize is that I hurt people.  I hurt the people I sold drugs

10   to.  I hurt my family and friends.  And most of all, my

11   children.  Now I live amongst addicts and hear their stories.

12   I pray that my children and others are not exposed to those

13   same drugs.  I grew up in a drug environment.  I hate to see

14   needles and crack bottles.

15        I grew up with my mom and sister.  My dad was barely

16   around.  I had no male figures in my life.  I won't blame

17   anyone for my mishaps either.

18        Your Honor, you're about to sentence me to prison

19   time, and I understand why.  I broke the law.  I've had a

20   lengthy period of my life where I was able to work and provide

21   for myself and my family, and I had nothing to do with the

22   streets.  I just took that wrong turn for a split second, and

23   now many lives are changed forever.

24        I've had no other arrests other than a traffic

25   violation since I have been an adult.  Since I have been an

1    MDC, I've witnessed violence, I have been threatened with

2    violence, but I have not engaged in criminal activity.  One

3    thing I look forward to is my release and reentering the lives

4    of the people who you see in the courtroom today.  I'm also

5    looking forward to entering the lives of the people you don't

6    see here today — my four children.  I haven't seen you guys in

7    298 days, almost 8,000 hours.  We don't get to talk much due to

8    me being on lockdown all the time and me putting myself in this

9    place.  I miss you all so much, and daddy's sorry for leaving

10   you outside.  I pray I soon get back home.  The reason, watch

11   you guys grow.  I have two jobs awaiting my arrival home.  I

12   hope I never leave you guys again.

13           Also, I just want to thank the people who wrote

14   letters on my behalf, the people who come to see me in my

15   darkest time.  I appreciate the love and support.

16           Once again, thank you, your Honor, for letting me

17   speak.  I love you all, and leave here knowing I closed a

18   chapter on my life that I never shall return to.  Never take

19   life for granted.  Thank you, all, once again.

20           Thank you, your Honor.

21           THE COURT:  Thank you, Mr. Wilson.  And I hope that

22   you will write those words of love for your family and

23   commitment to not going back on this path after you have done

24   your sentence here.  Write that commitment on your heart.

25   Write it on your forehead so you see it every time you look in

1    the mirror, metaphorically, and you will live your life in a

2    way that lets your family believe it and be encouraged by it

3    every single day in everything that you do.

4            I'm now going to ask that everybody sit quietly here

5    for me while I reflect on what I've read and heard and decide

6    on the sentence, which I will then explain and announce.  So

7    we'll all just sit quietly.

8            (Pause)

9            THE COURT:  Thank you for your patience.

10           I read all submissions carefully before coming to

11   court today, and I've listened carefully to everything that has

12   been said in court today.  This Court has discretion, taking

13   into account the applicable statutory provisions, in exercising

14   its power under Section 3553(a) of Title 18 to determine the

15   particular sentence to be imposed in each particular case.

16           Section 3553(a) requires the Court to consider a

17   number of specific factors and sentencing goals.  These include

18   the nature and circumstances of the offense and the defendant's

19   history and characteristics, the need for the sentence imposed

20   to reflect the seriousness of the offense, promote respect for

21   the law, and provide just punishment, deterrence, protection of

22   the public, and the provision of any needed services in the

23   most effective manner.

24           The Court must also consider the types of sentences

25   that are available and the applicable provisions of the

1   sentencing guidelines, as well as the need to avoid unwarranted

2   sentencing disparities among defendants with similar records

3   who have been found guilty of similar conduct.

4           The law requires this Court to impose a sentence that

5   is sufficient, but not greater than necessary, to address the

6   statutory sentencing purposes.

7           As to the sentencing guidelines, I conclude that the

8   applicable guideline offense level is 34 and that the

9   applicable Criminal History Category is II, for the reasons

10  that are detailed in the presentence report.

11          Accordingly, the advisory guideline range for a

12  custodial sentence is from 168 to 210 months of imprisonment.

13  The statutory mandatory minimum term of imprisonment is

14  four years, and the statutory mandatory minimum term of

15  supervised release is -- sorry, the mandatory minimum term of

16  imprisonment is 60 months, or five years, and the statutory

17  mandatory minimum term of supervised release is four years.

18          And I have used the November 1, 2023 edition of the

19  guidelines manual in making these determinations.

20          I've considered the question of whether there is an

21  appropriate basis for a departure from the advisory range

22  within the guideline system, and I don't find any grounds

23  warranting a departure within the guideline system.  And so I

24  have gone on to consider carefully the full range of

25  Section 3553(a) factors and goals and all of the facts that

have been put before me in light of those factors and goals.

And I will address some of them now.

First, the nature and circumstances of the offense:

The nature and circumstances of Mr. Wilson's crime are very

serious.  He was a manager of a drug trafficking organization

consisting of Bloods gang members who worked together to sell

heroin, fentanyl, and crack cocaine in the vicinity of

East 194th Street in the Kingsbridge neighborhood of the Bronx.

He not only helped to lead the operation, source the drugs, and

direct younger gang members to sell drugs, but he also sold

drugs himself, something that Mr. Ebanks commented on today,

the drugs selling part.

The Bloods group with which Mr. Wilson associated also

kept firearms to protect the drug business and is believed to

be responsible for a significant volume of drug sales and

shootings.

And at one point in 2017, Mr. Wilson ordered two of

his workers to retaliate against a rival gang with a shooting,

and the result was a shootout between the two gangs in a

residential area.

According to the defense submission and information

proffered by family members, Mr. Wilson turned to this

dangerous and potentially deadly activity to provide an income

for his family after he lost his job due to an injury.  While

devotion to family care is, of course, more positive than pure

1    greed or love of gang activity, it is appalling that even if

2    this timetable is true, after a young adulthood in which he

3    himself was a victim of serious violence, and he spent more

4    than a decade in prison, and he had been reimprisoned because

5    of parole violations, he would choose to support his family by

6    leading younger men to engage in gang-related drug sales and

7    violence, exposing customers to the deadliest known street drug

8    and helping to keep the 194th Street area extremely dangerous

9    and challenging for families trying to raise their children and

10   live legitimate lives.

11        Turning to Mr. Wilson's history and personal

12   characteristics:  Mr. Wilson was born in the Bronx in 1983,

13   just about 40 years ago.  His father was largely absent during

14   his early life, and his father was incarcerated when Mr. Wilson

15   was born, and he recalls that his father struggled with drug

16   addiction.  Mr. Wilson was raised by his mother, who served as

17   the sole caregiver with the assistance of his grandparents, and

18   he has memories of a loving and caring relationship with his

19   mother, who provided for him even though she herself was

20   struggling financially.  He has siblings with whom he has good

21   relationships and from whom I have heard from in advance of

22   this sentencing.

23        And as indicated by the many letters of support that I

24   have received in aid of my sentencing determination, his family

25   are well aware of his case and remains supportive, both his

biological family and his intended marital family.

         Mr. Wilson reports that except when he was in prison,
he's lived in the Bronx within a violent neighborhood
throughout his life.  And it is clear that he has been both a
victim and a perpetrator of serious violence.

         As a 14-year-old, he was the victim of a vicious
assault where the perpetrator slashed Mr. Wilson's face,
requiring him to get over 50 stitches and permanently disabling
him from being able to smile or frown.

         He later suffered a gunshot wound to his leg when he
got into an altercation with an individual attempting to rob
him.  And in 2015, Mr. Wilson was stabbed five times in the
back and his chest area, leading to a collapsed lung.

         He was convicted at age 17 of assault in the
first degree for shooting another individual.  He got a 13-year
sentence.  He was paroled after 11 years.  His supervision was
checkered with arrests for parole violations and two episodes
of return to custody.  And the offense that brings us here
today was committed during one of the periods in which he was
on release on parole.

         He has had a sporadic legitimate employment record in
the past, working in a variety of fields, including
maintenance, deli, and sanitation work.  He has been invited to
return to the carting company, and that is a testament to his
ability and willingness to work hard and well when he has

1   legitimate opportunity, and his father-in-law has also arranged

2   for him an opportunity to work in hotel housekeeping.  He has

3   participated in vocational training and other programs while at

4   the MDC, when able, and that is a good sign.

5          He has four children, and clearly cares about his

6   children very much.  He was living with his current partner

7   when he was arrested.  They have two children together.  Both

8   are under the age of five.  And his crime and his arrest have

9   had profound effects on his family.  They have had to change

10  their residence.  He has chosen not to see his children while

11  he is in custody, but if he did see them, they would have to

12  see him in custody.

13         In their letters to the Court, Mr. Wilson's family and

14  friends express a deep conviction that Mr. Wilson is a loving,

15  kind, and caring person who possesses the capacity to turn his

16  life around, and as Mr. Ebanks noted, one family friend speaks

17  of his selfless actions in connection with a fire, running into

18  a fire, not only to rescue people, but also to make sure that

19  they had some provision for clothing when it was clear that

20  they would not be able to return to their home.  And family

21  members and others have promised to help Mr. Wilson obtain

22  employment, live as a family man and a law-abiding citizen, and

23  show that Mr. Wilson does have a robust supporting network.

24  And the very presence here in court today of, I would say,

25  approximately 20 people, perhaps a little more than 20 people,

1   is very significant, not only as a message to me, but also as a

2   message to Mr. Wilson and his family, who will definitely need

3   this sort of presence and encouragement and support over the

4   time that he serves his custodial sentence and thereafter,

5   throughout his whole life.  He needs support to stay on the

6   right track and good examples, and to know that much is

7   expected of him and that he is capable of delivering in the

8   right way on those expectations.

9           Turning to the statutory purposes that must be served

10  by a sentence:  The Court recognizes the need for the custodial

11  aspect of the sentence to provide just punishment, specific

12  deterrence, as well as general deterrence, meaning deterrence

13  of Mr. Wilson from going back into this criminal activity and

14  also deterring others who might be tempted to take the same

15  steps, and promotion of respect for the law.  And these needs

16  are particularly relevant here, given that Mr. Wilson was a

17  leader and organizer of an extensive drug trafficking operation

18  that spans several years and significantly harmed the Bronx

19  community in which it operated.

20          He committed this offense while he was on parole

21  supervision stemming from an earlier violent offense, and

22  although his judgment was, no doubt, clouded by the effects of

23  his traumatic upbringing and other circumstances of his life,

24  he made specific choices here.  And he made choices to engage

25  over a significant period of time in trafficking drugs that he

was aware could jeopardize his and his young family's future,

and he did it in a way that drew younger people into it as

well, perpetuating that criminal culture and dangerous activity

into another generation in this area.  That's very, very

serious.  And Mr. Wilson remained a fugitive for over

three years after the indictment was unsealed, and was arrested

in connection with reckless driving and flight from the

authorities.

        A lengthy custodial term, followed by a lengthy period

of supervision, are both necessary.  They will help address

issues of public protection and also provide Mr. Wilson with

the opportunity to obtain necessary services in an effective

manner.  I am glad that he is pursuing educational

opportunities, and I hope that he will take every opportunity

to build skills and build knowledge and learn good

decision-making, and prepare himself every day in every way for

a successful and peaceful and positive return to his family and

his community.

        He was not deterred from returning to drug selling by

the lengthy prison term that he served in the past, nor by the

family that he has built, and it is extremely troubling, and it

raises deep concerns about danger to the public and questions

of what it will take for him to truly reform.  His words here

and the emotions that he displayed here in court suggest that

the reality of the pain of separation from his children and his

1    loved ones may make a difference while he is incarcerated and

2    when he is released.  It is hard to know, but that is a

3    positive sign in all of this.

4           The Court recognizes the need to avoid unwarranted

5    sentencing disparities among similarly situated defendants,

6    and, as I confirmed earlier, I have reviewed the sentences that

7    were imposed on his codefendants, all of which were below

8    guideline, except possibly to the extent that some were

9    mandatory minimum sentences in connection with specific crimes

10   that work that way under the guidelines and the law.

11          And the government has explained convincingly today

12   that Mr. Wilson, who is notably older than all of his

13   codefendants and was a supervisor of the drug trafficking

14   operation, is more culpable than each of his sentenced

15   codefendants.

16          And so, in consideration of the seriousness of the

17   offense and the need to provide for specific and general

18   deterrence and protection of the public from the dangers of

19   heroin, fentanyl, and crack cocaine distribution and use, and

20   associated violence, a significant custodial term is warranted

21   here.  The Court finds that the mandatory minimum of five years

22   is far too short to serve the statutory purposes of sentencing

23   in their entirety, and the guideline sentence for this offense

24   is, on the other hand, somewhat longer than necessary to

25   achieve the statutory sentencing goals, particularly in light

1    of the required consideration of sentencing disparities.

2            The Court also takes into account the challenging

3    circumstances of Mr. Wilson's upbringing, including his

4    traumatic experiences, Mr. Wilson's positive efforts while in

5    custody and his family circumstances, and including the family

6    that has embraced him and committed to continuing to support

7    him.  And so the Court has concluded that a moderate downward

8    variance from the calculated guideline range is necessary to

9    fashion a sentence that is sufficient, but not greater than

10   necessary, to satisfy the statutory purposes of sentencing.

11           I will now state the sentence that I intend to impose.

12           Mr. Wilson and Mr. Ebanks, would you please stand.

13           Mr. Wilson, it is the judgment of this Court that you

14   are to serve 144 months of imprisonment, to be followed by

15   five years of supervised release.

16           The standard conditions of supervision 1 through 11

17   and 13, as detailed in the sentencing guidelines manual, will

18   apply.  And these include the condition that you must not own,

19   possess, or have access to a firearm, ammunition, destructive

20   device, or dangerous weapon.

21           And in addition, you will be subject to the following

22   mandatory conditions:

23           You must not commit another federal, state, or local

24   crime;

25           You must not illegally possess a controlled substance;

1        You must refrain from any unlawful use of a controlled

2    substance, and you must submit to one drug testing within

3    15 days of placement on supervised release and at least two

4    unscheduled drug tests thereafter, as directed by the probation

5    officer.

6        You must cooperate in the collection of DNA as

7    directed by the authorities.

8        You must also meet the following special conditions:

9        You must participate in an outpatient substance abuse

10   treatment program approved by the probation office.  And this

11   may include testing to determine whether you have reverted to

12   the use of drugs or alcohol.

13       You will be required to contribute to the costs of the

14   services rendered as a copayment in an amount determined by the

15   probation officer based on your ability to pay or the

16   availability of third-party payment.

17       I authorize the release of available drug treatment

18   evaluations and reports, including the presentence

19   investigation report, to the substance abuse treatment provider

20   as directed by the probation officer.

21       You must submit your person and any property,

22   residence, vehicle, papers, computers, other electronic

23   communications, data storage devices, Cloud storage or media,

24   and your effects to a search by any United States Probation

25   Office assisted by law enforcement, if needed.

1            Any search is to be conducted when there is reasonable

2    suspicion concerning violation of a condition of supervision or

3    unlawful conduct.  Failing to submit to a search may be grounds

4    for revocation of supervised release.  And you must inform any

5    other residents that the premises may be subject to search

6    pursuant to this condition.  Any search must be conducted at a

7    reasonable time and in a reasonable manner.

8            You must not associate or interact in any way,

9    including through social media websites, with any persons known

10   to you to be gang members or associates, particularly members

11   and associates of any Bloods gang, and particularly the

12   194 Bloods.

13           You will be supervised by your district of residence.

14           In light of your financial circumstances, I will not

15   impose a fine on you.

16           I will order that you pay to the United States the

17   mandatory special assessment in the amount of $100, which is

18   payable in quarterly installments of $25 through the Bureau of

19   Prisons' Inmate Financial Responsibility Program.

20           You must inform the probation office of any change in

21   your financial circumstances and notify the

22   United States Attorney for this district within 30 days of any

23   change of mailing or residence address that occurs while any

24   part of the special assessment remains unpaid.

25           Mr. Ebanks, are there particular recommendations that

O4A6WILS                    Sentencing

1   you would ask that I make to the Bureau of Prisons concerning

2   the location and designation and any other matters?

3           MR. EBANKS:  Your Honor, if Fort Dix is a possibility,

4   I would ask for Fort Dix because of its proximity to the city

5   and the fact that my client has four young children.

6           THE COURT:  I will recommend designation to Fort Dix

7   for the maintenance of family ties.

8           Do you also want me to recommend an opportunity to

9   participate in the RDAP program?

10          MR. EBANKS:  Yes, your Honor, I do.

11          THE COURT:  I will make that recommendation as well.

12          And as you may know, Mr. Wilson, that program is a

13  program toward the end of the time that you're serving, that

14  provides intensive substance abuse avoidance training and also

15  reentry and job preparation training.  A lot of people want to

16  be in the program, and I can't guarantee that you can get into

17  it, but you can certainly help yourself by continuing your good

18  record of, you know, not having disciplinary incidents, and

19  being industrious and deliberate about improving yourself and

20  improving your life in the way you live, and that will

21  demonstrate that you are the type of candidate that they want

22  for this program, which can help you, and, in certain

23  circumstances, being in the program can also help to reduce the

24  amount of time you ultimately serve on your sentence.  So

25  keeping focused on that is something important to do for

O4A6WILS                    Sentencing

1    yourself and for your family.

2              MR. HOBSON:  Your Honor, I'll note, with respect to

3    RDAP, that the defendant has not indicated he has a drug

4    problem.  And his violence, his history of violence, also, I

5    think, might make him ineligible for RDAP.  Certainly, it

6    wouldn't warrant prioritizing him over other defendants who do

7    have drug problems and who have not had a history of violence.

8              MR. EBANKS:  Your Honor, it's my understanding that

9    the folks at RDAP do a fantastic job screening who they are

10   going to accept into the program.  And the presentence report

11   indicates that up until the time of my client's arrest, he

12   smoked marijuana on an almost daily basis, so...

13             THE COURT:  I did recall that the presentence report

14   indicated a marijuana habit, and the probation department did

15   recommend substance abuse treatment, and so there is an

16   indication of a substance program, and it is, as I said, up to

17   the Bureau of Prisons, ultimately, to determine who they put

18   into the program.  Certainly, it cannot hurt Mr. Wilson or his

19   chances or his future for him to live in a way to make himself

20   the strongest candidate that he can make himself, which we're

21   encouraging him to do.

22             MR. HOBSON:  I agree with your Honor.  The concern I'm

23   expressing is that I do think the Bureau of Prisons gives heavy

24   weight to drug recommendations, and the concern that

25   prioritizing him over more worthy individuals who could more

1    benefit from the program.  That's the concern I'm expressing.

2    Obviously, anyone could benefit from a program.

3          THE COURT:  Yes.  Well, it's important for Mr. Wilson

4    to know that there's no guarantee.  For me, seeing Mr. Wilson

5    here, knowing his circumstances and knowing how much concern

6    there is about him with his family, and the expression he's

7    made to me of a desire and an intention to live in the best and

8    most lawful way he can when he gets out, it's important to me

9    for him to have the chance to be in that program.  The Bureau

10   of Prisons will ultimately look at all of the actual candidates

11   at the actual time and make a decision that is correct in the

12   view of the Bureau of Prisons, and that's their job.  So I am

13   not going to decline to make the recommendation.  I am going to

14   make the recommendation.

15         MR. HOBSON:  Understood, your Honor.

16         THE COURT:  And so I believe this sentence as a whole

17   is reasonable within the meaning of the law, sufficient,

18   appropriate, and no greater than necessary to satisfy the

19   statutory purposes of sentencing, which include punishment and

20   deterrence.

21         Mr. Ebanks, do you know of any legal reason why this

22   sentence should not be imposed as stated?

23         MR. EBANKS:  I do not, your Honor.

24         THE COURT:  Mr. Hobson, do you know of any legal

25   reason as to why this sentence should not be imposed as stated?

1              MR. HOBSON:  No, your Honor.

2              THE COURT:  The sentence, as stated, is imposed.

3         And I must say something to you about appeal rights,

4    Mr. Wilson.

5              To the extent you have not given up your right to

6    appeal, you have the right to appeal this sentence.  If you are

7    unable to pay the costs of an appeal, you may apply for leave

8    to appeal *in forma pauperis*.  At your request, the Clerk of

9    Court will file a notice of appeal for you.  And any notice of

10   appeal must be filed within 14 days of the judgment of

11   conviction.  So make sure that you speak with Mr. Ebanks about

12   your rights in this regard before you part company today.

13             Mr. Hobson, are there remaining counts or underlying

14   indictments that need to be addressed?

15             MR. HOBSON:  There are, your Honor.  We move to

16   dismiss them.

17             THE COURT:  That motion is granted.

18             Mr. Wilson, I would like to say a few more words to

19   you and to your family, and I thank you, all, in advance for

20   listening.

21             You committed a very serious crime, and the length of

22   the sentence that you received today reflects that.

23             And you've clearly made a series of very poor choices

24   in the past, but every single day of your life, every breath

25   you take, you make decisions, and you have opportunities to

 1   make decisions in different ways.  And you talked to me about

 2   having reflected on your past and your future in the time that

 3   you spent at the MDC, and I want you to continue to do that,

 4   both reflecting on what you don't want to repeat and what you

 5   want in the future.

 6             And when you think about choices that you have, think

 7   through the potential consequences of actions before you take

 8   them so that what you do every day for the rest of your life

 9   will be consistent with the honor in which you hold your

10   family, the love you have for them, the honor that you should

11   hold yourself in as a man, and what you want for your future.

12             And you have told me you want a future of being able

13   to be with your family, to be a strong example for your

14   children, to be a positive force.  That's what I'm hearing in

15   everything else.  To do that, it doesn't happen by accident,

16   especially when you have a past where you haven't made those

17   kinds of choices.  That happens by thought and deliberation and

18   commitment and forethought.  So I urge you to put that work

19   into it.

20             You have a history of working and being a helpful and

21   positive person, along with a lot of negative stuff, but the

22   fact that you have these skills, you have these determinations

23   that you have, you have impulses that send you into danger to

24   help somebody else, that you have caring in your soul for other

25   people, shows me that you can pull that side of you together

1  and shrug the rest of the stuff off.  And so keep a vision of

2  yourself in that way, and do something every day that takes you

3  deeper into realization of that vision and toward the life that

4  you are envisioning for yourself afterward, even while you're

5  serving your sentence.  And in that way, you can be an

6  encouragement every day to your children, to your family, to

7  all these people here who love you.

8          And I'm turning to your family now.

9          It is important that you provide practical support for

10  Mr. Wilson's family.  These are going to be long years that are

11  hard.  It's also important that you find ways consistently to

12  encourage not only Mr. Wilson's family, but encourage him, to

13  consistently show him that he is a person of worth, he is a

14  person worthy of your love, worthy of your highest

15  expectations, and that he has all of that all the time, so that

16  he can continue to look forward to being reunited and know that

17  he has that uplift and support, even as he is in very

18  challenging circumstances, serving time that's going to be

19  really hard for him every minute and every day.

20          I wish all of you continued strength and wisdom in the

21  way that you walk for and with each other every day.

22          Mr. Wilson, when you are released, you will have the

23  guidance and support of the probation office in reestablishing

24  your day-to-day life during your supervised release period.

25  You have been on parole before.  You fell short on parole

1    before.  You were remanded on parole before.  Yet, that's one

2    of those sets of decisions you need to look back on and figure

3    out how not to repeat.

4            I also want you to know that my colleagues in the

5    probation office are committed to helping people change their

6    lives.  That's why they are in that work.  They work really

7    hard at it.  They are not there to just tick off call-in sheets

8    or whatever and make people's lives difficult.  What gives them

9    joy is to be able to support transformation.  And they have

10   resources that can be helpful to you and helpful to your

11   family, and so I encourage you to take the supervision

12   requirement over that long period of time in that spirit, as a

13   source of a stronger foundation and building blocks for

14   yourself and for your family as you go forward.

15           I do have to caution you that you have to comply

16   strictly with all of the conditions that I have set for your

17   supervised release.  If you are brought back before me for

18   violating any of them, I may sentence you to another term of

19   imprisonment.  So please do not ever put me in a position of

20   having to make that decision.

21           You know, my husband hopes that I'll retire sometime,

22   but I'm pretty sure I'll be here when you get out.  So don't

23   come back and see me again.  And if I don't see you again, that

24   will be because you're succeeding, and that will be, you know,

25   a reason for rejoicing.

O4A6WILS                    Sentencing

1          And so, I thank you for listening.  I thank all of you

2   for listening.  I thank counsel for their advocacy.

3          I will direct that a copy of the presentence report be

4   prepared for the Sentencing Commission and the Bureau of

5   Prisons.  All other copies of the report must remain

6   confidential.  If an appeal is taken, counsel on appeal are to

7   be permitted access to the report.

8          Counsel, is there anything further that we need to

9   address together this afternoon?

10          MR. HOBSON:  No, your Honor.

11          MR. EBANKS:  No, but thank you, your Honor.

12          THE COURT:  Well, thank you.

13          And I would ask that the Marshals permit Mr. Wilson to

14   acknowledge his family as he leaves the room and make provision

15   for him to be able to speak with Mr. Ebanks about the appeal

16   issue.  And I thank you for making those accommodations.

17          Stay safe and keep well, everyone.  We are adjourned.

18          (Adjourned)

19

20

21

22

23

24

25